IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07-20286 MlV |
| | ) |
| ONDRAE PIRTLE, | ) |
| | ) |
| Defendant. | ) |

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S SECOND MOTION TO
SUPPRESS
_____

The defendant, Ondrae Pirtle, has been indicted on one count of possession of a firearm, a Ruger 22 caliber rifle, on or about June 4, 2007, in violation of 18 U.S.C. § 922(g). Presently before the court is Pirtle's October 31, 2007 Second Motion to Suppress all alleged statements made by Pirtle. The motion was referred to the United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)-(C).

Pursuant to the referral, an evidentiary hearing was held on December 13, 2007. At the hearing, the government presented two witnesses: Detective Errol Freeman and Detective Jack Bailey, both of the Memphis Police Department. Pirtle did not adduce any testimony. Six exhibits were introduced: the affidavit, the search warrant, and a photograph of the rear exterior of Pirtle's apartment (Ex. 1); a photograph taken of the rear exterior of the apartment

complex at 4837 Tulane (Ex. 2); a photograph of Pirtle's apartment door showing a storm door attached to the main door (Ex. 3); a memo written by police to the file regarding the execution of the search warrant (Ex. 4); photographs taken by Detective Freeman during surveillance of the location on June 2, 2007 (Ex. 5); and Pirtle's rights waiver form (Ex. 6).

After careful consideration of the statements of counsel, the testimony of the witnesses, the exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that Pirtle's second motion to suppress be denied.

## PROPOSED FINDINGS OF FACT

On June 4, 2007, Detective Freeman obtained a search warrant from Judicial Commissioner Ron Johnson to search the person and premises of a black male known as "Red" who was believed to be selling and storing cocaine at 4837 Tulane #3 in the Tulane Apartment Complex in Memphis, TN.  Detective Freeman has been employed with the Memphis Police Department for over eight years and is currently assigned to the Organized Crime Unit where he has spent the last four years working to curtail drug trafficking. Detective Freeman testified that he has attended numerous training courses, including some offered by the Drug Enforcement Agency, and has used confidential informants hundreds of times throughout his undercover

and surveillance investigations.

According to Detective Freeman's testimony, after he received information from a confidential informant that an individual known as "Red" was selling drugs at 4837 Tulane #3, he began investigating by undertaking surveillance and doing "jump outs." "Jump outs" consist of talking to people thought to have been involved in hand-to-hand narcotics transactions at 4837 Tulane #3. The confidential informant told Detective Freeman that he had been inside the apartment and observed narcotics transactions taking place at the doorway of the apartment. While conducting surveillance on three or four separate occasions over a two-week period, Detective Freeman noticed walk-up and drive-up traffic that he knew from his experience and training to be consistent with narcotics sales. He observed hand-to-hand sales at the doorway of 4837 Tulane #3 and an individual who matched the description of "Red" come out of the apartment on at least two occasions. In addition, Detective Freeman had the confidential informant buy drugs on two occasions within five days of the issuance of the warrant. Although the buys took place at the same apartment complex, neither of these buys took place at this particular apartment. No arrests were made from these buys.

On June 4, 2007, Detective Freeman also obtained another search warrant for the apartment adjacent to 4837 Tulane #3. At

3

approximately 5:15 p.m. that day, two separate teams simultaneously executed both warrants. Detective Freeman testified that when police arrived to execute the warrant, there were three or four people standing outside the apartment, including a man later identified as Pirtle. These individuals were detained for the protection of the officers and to prevent the destruction of evidence. Detective Freeman, along with his team, entered the apartment and observed two other individuals inside the residence. These individuals were also detained, but neither matched the description of "Red."

The government introduced into evidence a memo written to the file by Detective Freeman regarding the circumstances of this search of Apartment #3. *See* Def.'s Ex. 4. The memo stated that two black males, one of whom matched the description of "Red," were standing in front of #3. One of them was detained, but the individual who appeared to be "Red" fled the scene and was not caught, despite a brief chase by police. Although Detective Freeman saw this individual flee the scene, he did not know which officer chased him, as he was busy at that time executing the warrant. In addition, the memo stated that three people were inside the apartment at the time the warrant was executed, not two people, as Detective Freeman had testified.

A search of the apartment's bedroom yielded powder cocaine,

crack cocaine, a crushed-up blue substance later determined to be ecstasy, and marijuana. There were two one-dollar bills on the bed, one containing powdered cocaine and the other containing the crushed-up blue ecstasy pill. Detective Freeman testified that another officer, Detective Smith, found the Ruger .22 caliber rifle in another room.

After the drugs were discovered and tested at the scene, according to Detective Freeman's testimony, other officers advised him that one of the individuals outside, Pirtle, was stating that the individuals inside the apartment should not be arrested because he was the owner of the narcotics. When Detective Freeman stepped outside, he heard Pirtle describe the exact location of the drugs and identify the blue crushed-up substance as an ecstacy pill. Pirtle also told Detective Freeman that there was a gun in the bedroom. According to Detective Freeman, no one was questioning Pirtle when he made these statements. Based upon the precise information given by Pirtle, Detective Freeman released the individuals who had been detained in the apartment and arrested Pirtle.

Detective Freeman instructed other officers to complete a waiver of rights form with Pirtle. As the rights waiver form was being completed, Detective Freeman observed Pirtle continue to talk and heard him state that he wished the officers would hurry up

5

because he was anxious to get to jail, didn't mind going to jail, and "runs the jail."

The second witness to testify was Detective Jack Bailey, a five-year veteran of the Memphis Police Department who has been assigned to the Organized Crime Unit for the past two years. Detective Bailey was assigned to provide perimeter security for the two entry teams who were executing the search warrants, due to the apartments' location in a high crime area. When the teams began to execute the warrant, Detective Bailey observed some individuals walking away from the door. He did not, however, notice anyone fleeing the scene.

As part of his duties in providing perimeter security, he detained those individuals straying from the door. One of these individuals was Pirtle, who was told three times to get on the ground. Detective Bailey testified that Pirtle seemed worried about his children, who, Pirtle said, were inside the apartment.

While the apartment was searched, Pirtle remained outside on the ground in compliance with Detective Bailey's commands. Detective Bailey, however, was not constantly supervising Pirtle. He testified that his main focus was securing the perimeter and therefore he heard only part of what Pirtle said. He did recall that Pirtle was very talkative and appeared very unconcerned about the severity of the situation. Detective Bailey heard Pirtle

6

telling other team members that he owned the drugs and knew their exact location. In addition, Detective Bailey testified that when the gun was brought out of the apartment, Pirtle claimed ownership of it as well. At the time the evidence was brought out of the apartment, Detective Bailey testified that he recalled hearing Pirtle say that everything in the apartment was owned by him and no one else. Detective Bailey heard no one questioning Pirtle when Pirtle made these statements.

After Pirtle was arrested, Detective Bailey and his partner completed a rights waiver form around 5:50 that evening, roughly 35 minutes after the search began. *See* Pl.'s Ex. 6. Pirtle sat on the concrete stoop beside the apartment's door as he answered questions regarding the ownership of the gun. Detective Bailey testified that Pirtle disclosed on the form several offenses for which he had been convicted and imprisoned for over eleven years. *See* Pl.'s Ex. 6. Detective Bailey noted that his interactions with Pirtle were friendly. Pirtle wanted him to expedite the paperwork so that he could get to "201" because he "runs that place."

This court finds the testimony of both law enforcement officers to be fully credible. On all relevant matters essential to the Fourth Amendment issues herein, the law enforcement officers corroborated each other's testimony and such testimony was believable. In addition, the testimony of both witnesses remains

unrebutted. Pirtle did not testify and he called no witnesses, nor was the testimony of any witness impeached.[1] Accordingly, the court finds as fact that the statements and admissions made by Pirtle occurred as described by the testimony of the witnesses as set forth herein.

PROPOSED CONCLUSIONS OF LAW

Pirtle contends that all statements he made at the scene of arrest and subsequently while in formal custody should be suppressed because they were in response to police interrogation and were not made voluntarily. Additionally, he maintains that the *Miranda* warnings given were not sufficiently adequate. Because Pirtle is attempting to suppress two different sets of statements made at different times, they will be discussed separately.

A. <u>Statements at Scene of Arrest While Being Detained</u>

It is undisputed that Pirtle was standing outside the door of his apartment and was detained while the search warrant was executed and the apartment searched. The government contends that while detained, Pirtle spontaneously admitted to the officers the locations and ownership of the narcotics. Pirtle maintains that these statements were made in response to questioning by law enforcement and therefore should be suppressed due to the lack of

---

[1] The court finds that Detective Freeman's inconsistent testimony about the number of individuals inside the apartment was not sufficient to impeach all his testimony.

*Miranda* warnings. Pirtle also argues that, even if the statements were not made in response to direct police questioning, the actions of the officers in bringing the evidence out of the apartment directly past Pirtle amounts to conduct which would likely elicit a response from Pirtle. Therefore, Pirtle urges that his statements as to ownership and location of the drugs and gun should be suppressed since he had not waived his *Miranda* rights at this point.

The law is settled that a person taken into custody or otherwise deprived of his freedom by authorities in any significant way must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). *Miranda* prohibits the use of unwarned statements made by a defendant "stemming from custodial interrogation." *Miranda*, 384 U.S. at 444. The term "interrogation" under *Miranda* refers to express questioning and any words or actions on the part of the police, other than those normally attendant to arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the defendant. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A "volunteered statement" is not affected by the *Miranda* rule, and

prior warnings are not required for admissibility. *See Miranda*, 384 U. S. at 478.  This is true when there is no "functional equivalent of questioning".  *Innis*, 446 U.S. at 302.

There was no proof presented at the hearing that police were questioning Pirtle when he admitted that he owned the gun and drugs. Both detectives denied that any questioning of Pirtle took place. Pirtle did not testify nor did he call any witnesses who testified about any questions being asked.  Detective Freeman testified that while he was in the apartment other officers heard Pirtle state that no one detained inside the apartment should be arrested because the evidence found belonged to him and to him alone. Once the other officers notified Detective Freeman of these statements of ownership, he stepped outside and heard Pirtle describe the exact location of the drugs and the identity of the questionable blue substance found in the dollar bill.  Pirtle also told Detective Freeman that a gun was in the bedroom.  Because it was clear to Detective Freeman that the evidence belonged to Pirtle, he then released the individuals who had been detained in the apartment and arrested Pirtle.

Detective Bailey corroborated Detective Freeman's testimony. Detective Bailey remained outside the entire time the warrant was being executed. While Detective Bailey was not constantly supervising Pirtle, he was continuously in the area and did observe

some of what was happening regarding Pirtle's statements. He testified that Pirtle was very talkative and appeared very unconcerned about the severity of the situation. Detective Bailey heard Pirtle telling other team members that he owned the drugs and knew their exact location. In addition, Detective Bailey observed that Pirtle claimed ownership of the gun when the gun was brought out of the apartment.

Pirtle urges the court to draw an inference that the officers questioned Pirtle for the reason that no person would make the kinds of statements Pirtle made unless he was being questioned. Pirtle also argues that the government's proof does not sufficiently negate any questioning because the government's two witnesses were not with Pirtle at all times and another officer could have questioned him during those gaps. In response, the government points out that the officers would not have known to question Pirtle at all because he wasn't "Red," the man described in the search warrant as selling drugs, and the officers did not know who Pirtle was. The court finds the government's position more persuasive and declines to draw an inference.

Pirtle's final argument is that the actions of the police in removing evidence from the apartment amounted to conduct likely to elicit a response and thus was equivalent to interrogation. This argument is without merit. Both detectives testified that Pirtle's

11

spontaneous statements began almost immediately after the search warrant was executed and while the three individuals inside the apartment were being detained. Detective Freeman noted that other officers informed him of Pirtle's statements right after the evidence had been discovered and apparently before the evidence was removed from the apartment. Pirtle described the exact location of the drugs, confirmed that the questionable blue substance was ecstasy, and told Detective Freeman that a gun would be in the bedroom. Similarly, Detective Bailey remarked that Pirtle was very talkative and unconcerned about the situation. He observed Pirtle telling other team members from his position on the ground that the drugs were his. Detective Bailey also heard Pirtle acknowledge ownership of the gun as it was brought out of the house, but it appears that Pirtle had already claimed ownership of the gun and disclosed its location to Detective Freeman before the weapon was removed from the house.

Accordingly, there is no legitimate basis for suppressing Pirtle's spontaneous statements made at the scene while he was detained during the search of his apartment. Both detectives denied that any questioning occurred, and the testimony of each detective corroborated the other. Because this court finds credible the testimony of the detectives, and because Pirtle had already made the statements before the evidence was removed from the apartment, this

court finds that no interrogation took place. Therefore, the statements made before Pirtle's arrest should not be suppressed.

B.  <u>Statements Made While in Custody</u>

Pirtle argues that the incriminating written statements he gave to Detective Bailey during the execution of the rights waiver form were made without a voluntary waiver of *Miranda* rights, were the product of coercion, and therefore should be suppressed.

Before introducing an incriminating statement made by a defendant, the government bears the burden of proving by a preponderance of the evidence a voluntary, knowing, and intelligent waiver of the accused's *Miranda* rights. *Miranda,* 384 U.S. at 475. The standard for voluntariness of a waiver of *Miranda* rights is basically the same as the standard for voluntariness of a confession. *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). The general test for voluntariness of a confession is whether the accused's will was overborne or was the product of rational intellect and free will. *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

At the hearing, there was no proof presented of any threatening conduct by any officer toward Pirtle or any deception prior to Pirtle's incriminating oral statements to Detective Bailey. There was no evidence of objective coercion. *See McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). Detective Bailey testified that

13

Pirtle was pleasant and no one raised their voices. While answering questions from Detective Bailey for filling out the rights waiver form, Pirtle voluntarily disclosed that he had been convicted of and served over eleven years for offenses such as drugs, trespassing, domestic violence, child support, and driving with a suspended license. In response to the question on the form about the officers' treatment, Pirtle responded, "Ya'll alright." In addition, Pirtle repeatedly requested that the officers expedite his paperwork so that he could hurry to the jail, stated that he did not mind going to jail, and stated that he "ran" the jail.

It is undisputed that Pirtle had lengthy experience with the criminal justice system. He had been arrested more than half a dozen times. He had served eleven years in prison. He acknowledged his understanding of his *Miranda* rights. There was no evidence his statements were coerced in any way. All of the proof indicated that Pirtle was sufficiently intelligent and alert to understand his *Miranda* rights and the consequences of any incriminating statements, as he was advised. Pirtle made no request for the presence of counsel. *See Davis v. United States*, 512 U.S. 452 (1994). Therefore, it is submitted that Pirtle voluntarily waived his *Miranda* rights when he gave the incriminating statements, and that the statements were knowing, voluntary, and uncoerced. Accordingly, it is submitted that defendant's incriminating statements to

Detective Bailey should not be suppressed.

RECOMMENDATION

For the foregoing reasons, it is recommended that Pirtle's second motion to suppress be denied in its entirety.

        s/Diane K. Vescovo
        DIANE K. VESCOVO
        UNITED STATES MAGISTRATE JUDGE

        DATE:   January 2, 2008

NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.

ANY PARTY OBJECTING TO THIS REPORT MUST MAKE ARRANGEMENTS FOR A TRANSCRIPT OF THE HEARING TO BE PREPARED.